We'll call the matter of Ever Ulysses Serrano-Alberto v. Attorney General. And is it Mr. Nightingale? Yes, good morning. Good morning, may it please the Court. Zachary Nightingale for Petitioner Ever Serrano. I would like to reserve five minutes for rebuttal, please. Mr. Serrano has a valid and meritorious asylum case now thoroughly documented in great deal, including the expert declaration attached to the motion to reopen, which, as this Court found in Chardar, has to be taken as true for purposes of motions to reopen adjudication. That expert found that Mr. Serrano would be, quote, at high and predictable risk of egregious physical harm and death as a direct result of his status as a member of his nuclear family and a professional soccer player that rebuffed gang extortion demands. He also has a separate How much of the affidavit constituted new evidence, that is, evidence that could not have been presented initially? Well, it had two kinds of new evidence. One involved the new facts that occurred temporarily after the judge's decision. It's the judge's decision of February 4th, 2015. That is the date on the file. It also included new information about the country, both that had happened since, again, because of the breakdown of the truce among the gangs and the increased violence as a result thereof, but also it had new information about the significance of his life events based on the political and social environment in El Salvador, information that could never have been presented in the original hearing by Mr. Serrano. He was pro se. He was detained. He's not an English speaker. He's not educated in U.S. law, let alone the labyrinth of immigration law. And the judge, despite the fact that he was pro se, did not do the duty that's required of the judge to develop the record. And so while he mentioned I was a soccer player, he mentioned various family members, the judge didn't pursue that to understand the significance. And that's also an important aspect of what the new declaration from the expert fills that gap. But are you suggesting that there's a different standard or test for what constitutes new information with pro se and then later obtained as counsel? No, it's not a different test. You have to look at whether it was obtainable by him. So you do have to look at his circumstances. As a pro se detained individual to understand what it would be possible for him to obtain or to know about. For example, he explains in his declaration, I called my family back in El Salvador. They didn't even want to tell me anything that had happened to the family members. He wasn't in a position to be able to present everything. Similarly, he had no way to know the legal significance of the soccer involvement, that it had a political element to it that was relevant to the political opinion analysis. That one confused me a little bit. Why, I mean, he was a professional soccer player. I thought, you know, I read the transcript of the hearing. I thought he was claiming that it was his membership in this group, a group of professional soccer players who were targeted by gangs, that he brought that out. Am I wrong on that? What was not brought out, in fact he mentioned that, but what was not brought out is the fact, as the expert explained, the expert was personally familiar, as it turns out, with the soccer academies in that city. They were organized not just to train people on soccer, but also to provide a non-gang outlet to deter young people from the gangs. That was an explicit purpose in the government sponsorship. And that aspect that wasn't just a soccer or a vocation, it also had a political meaning within the context, is something that he, as a pro se individual, was not able to relate to the judge. But it appears he was able, subsequently, and did, obtain counsel, retain an expert. Why should he get special leeway in introducing things like an expert report or statements in an affidavit that could have been put in earlier, had he or his family opted to retain counsel earlier? I would analogize to this court's decision in Torre, which we cited, where that was on credibility, not on missing documents. But I think the analogy is apt, because in that case, the individual was not put on notice of the need for cooperation. And then we filed, excuse me, and this court held that before he could be denied relief, he has to be informed of the need for that cooperation. And we filed a 28J on a Ninth Circuit case that was recently issued in Batari, which shows exactly the problem that Mr. Serrano here faced. As an untrained individual, not knowing all the legal requirements for asylum, he didn't know what to present. And the judge did not elicit the additional information that would be relevant. When he's finally able to get that in a motion to reopen and present it, he's denied saying, you should have presented that earlier, even though there's no way he could be on notice of irrelevance. And that's the same situation here as the Ninth Circuit in Batari held, it's not fair to deny the case without putting him on notice and then deny a motion to reopen, saying you could have gotten it before. It becomes impossible. I think that's what's happened here. Is there any case you can point us to where an expert report is treated in that way? That is, someone who was pro se, but then later seeks to introduce expert testimony, something that presumably they could have retained earlier, had they known that that would have been helpful, has been deemed to constitute new evidence, material that wasn't previously available? I can't think of an exact case on that fact pattern. I'm not aware of one. The Shardar case that I mentioned does include an expert report on the current conditions. In that case, it was Bangladesh, which the Board of Appeals in that case had said, that's not new. And this court said, no, we have to take the expert's statements as true and see that there is new information that's directly relevant. I don't believe that included a pro se person below. But even more so, we think that because he was pro se, and we certainly cited cases indicating that additional care has to be provided to someone who's pro se. We cited a case from this court in the disability determination, but there's also a case law in the immigration situation identifying the labyrinthine nature of immigration law, complexity second only to tax law, and that when someone is pro se, it's the judge's obligation to develop the record, to do the follow-up. The judge in this case really was almost hostile and did not develop the record. You said almost hostile. Have you listened to the recording of the hearing? I've got the transcript. In a case such as this, should we be provided with a recording of the hearing so we can gauge whether there was hostility? It's hard to tell from the written word whether it was hostile or not. I certainly would have no objection to that happening. It's not routinely provided by the agency, so it's not made part of the record. Obviously, we were his attorney at the time. We got the case after the BIA's last decision. I think even without that recording, I suppose this court has the authority or the agency to produce it, but even without it, I think the nature of it, one thing I will note, it's all through a translator, interpreter. Of course, the judge is in English. You only hear his answers in Spanish and then translated, but I think you can tell from the way, and we quoted in the brief, how the judge repeatedly cuts him off, doesn't follow up on his answers, accuses him of not answering, and so I think it's even from the English text, it is clear the judge did not do her duty to follow up and fully develop the record, and that's the fundamental error that differentiates this from just the average case. What do we do about, where does this fall in the range of our cases? Because we certainly have been willing to find procedural due process violations where there's been explicit bias or where the judge has taken over the questioning, for example, or had been so angry and belittling as appearing in the transcript that we thought there was not the opportunity for the petitioner to present their case. But at the other extreme, with a case like Abdulrahman, we've said it's not enough for the immigration judge to be annoyed. We have to come back to the question of whether there was the opportunity to reasonably present the case and, of course, prejudice. Why is this closer to Abdulrahman? Right. So I believe the answer is because it's not just the way the judge handled the actual hearing. That is merely indicative of the problem. The actual problem is the fact that the judge failed to follow up. First of all, she failed to put him on notice of the actual legal requirements. He knew nothing about the legal requirements of asylum, and she never told him. She never said, here are the categories, she never said what one central reason means, what evidence you have on this. She never explained to him the legal significance. She said, if you have evidence, you can present it. Well, that doesn't tell him what kind of evidence is relevant. So that's the actual error by the judge, is not following up on the facts. She gets the facts out of him eventually, and she notes them in her decision, and the BIA takes note of that. But what the agency never did, whether it's the judge or the BIA, is actually put him on notice in a meaningful way of what is missing, and never follows up. That's the due care that the agency owes a pro se individual, of saying, and what about your family members, and what about the fact that it's soccer, is connected to the government. When you say gets the facts out of him eventually, I took it from your briefing that part of the argument is that there were many more facts, including the detail that was presented in the affidavit, that did not come out in the course of that hearing, and that would have, had he been accorded due process. That is true. There are both kinds. There are facts that had happened already, that he didn't get to. There were more family events, both before and after, and family as a social group is obviously a very important legal component that was never followed up on by the judge, never considered by the board. So it is our position that the agency, in the form of the judge and the BIA, committed error in both ways, in not developing all the possible relevant facts, which is one obligation on the judge. Not informing him of the significance, for example, of family as a social group, and not considering that in the first go-around. So it is two kinds of errors that the agency made, and the combination of that failure as now documented about what could have been presented, if he was properly placed on notice, clearly shows he was prejudiced by that failing of the agency. Was his ability to present, isn't it, I guess the question to have is, you say he didn't have the ability, he was course pro se, and he was detained. But once he was no longer detained and made bond, and moved to California to be with his sister, then he had the ability. I'm trying to look at this in terms of a precedent. Let's say he had stayed detained, and the agency did not have access to counsel. I'm trying to figure out, what do we tell the immigration judge, here's what you have to do. So in that, he had the benefit of making bond, and now being able to come forward with an affidavit of an expert, retained counsel, et cetera. I see my time, that's a good answer. So I guess there's two aspects to this. If he had never been able to obtain counsel, obtain the expert, and fully document the missing piece, he may not have been able to document the actual problem, because he wouldn't have been able to show what would have been different if he had actually been asked. But I think to directly answer the question of what should the judge have done, the judge should have, for example, when he mentioned the various family members, that there's an obvious connection to, could your family be a social group? And the judge could have followed up on the pattern of abuse to various family members. When he mentioned the soccer, the judge could have taken note of publicly available documents. Certainly, there's case law saying the agency can do that, can look at publicly available documents, the Department of State report, but other ones as well, about the significance of that. I think the judge in this case, for example, she asked him what he'd do for a living, and he said, I play soccer. And she cut him off as if not understanding that's even a profession, until he had to explain it. So the judge clearly could have done more to understand the significance of his activities in that particular country, El Salvador. That's the whole purpose of asylum, since the government does not provide counsel to people. There's got to be a way that a pro se person can actually present a valid case. And this is often factually and legally very complicated. The agency itself is struggling with meeting a particular social group, as we all well know. So it's certainly within the judge's obligation to put the person on notice, here are the requirements. Give me information so I can evaluate if you meet these XYZ requirements. None of that happens here. What is the particular social group that you're asking us to focus on at this point? Because the immigration judge obviously articulated one, and then before the BIA on the merits appeal, there was imputed political opinion, and another with a motion to reopen, a host of them that we're also seeing in your briefing. Is there one that you're espousing as the group that is the appropriate nexus here? Well, we actually do four, but I'll highlight them in order what I think the appropriate order is. Because the expert, as I mentioned at the beginning, clearly identified that members of his immediate family are a social group, and it's one of the main reasons that he and his family members are being targeted. And as we briefed, even the government has submitted a brief to the BIA in a case that we think is going to be the precedent, because they asked for briefing, where the government agreed that family can constitute a particular social group. We think his family meets that. Number two, professional soccer players who have resisted the game control. Again, expert explicitly referenced this being one of the reasons, and it certainly meets the social distinction requirement that the board has now. You don't have to reach whether that's an appropriate one, because we think it meets that requirement no matter what. But I'll just mention witnesses to crime, because his name was publicly mentioned in the news article when he was shot and his neighbor, the doctor, was killed. And this court's case in Garcia identifies witnesses to crime. And finally, more generally, salver men who resist gang control. But even that group you don't need to get to, I think. What was the last one I'm saying? Sorry. Salver men who resist gang control. Is this question, and you certainly identify it as one in your brief as well, but is it one we can even reach in light of Chenery Doctrine? The board was explicit here that it was assuming that he had established or stated a particular social group, and it dispenses this on the nexus ground. In light of that, can we address whether there was error in the immigration judge for the board's treatment of the particular social group? Strictly speaking, I don't think so. I don't think this is the case to reach those bigger issues, and I don't think this panel needs to address it in this case if it reaches one central reason, the nexus issue, which was, I believe you correctly identified, the reason for the board's denial and what this panel needs to reach. And in light of the evidence from the expert, I think that answers that question. We breach the whole asylum case to explain why his presentation in the motion to reopen shows he has a prima facie case for eligibility. We think the proper remedy is to remand back to the board to reopen, to have that hearing he never got to make the prima facie case. Strictly speaking, the legal basis for doing that, which this panel needs to reach, is only the nexus one central reason issue. I would add separately, the CAT case does not have the nexus requirement. So the board also erred on the CAT issue because it linked them together, and that is a totally separate reason for remand, even if the nexus, even if this court doesn't rule our way on the nexus issue, it's the only nexus for CAT. I'm glad you took us there because I'd appreciate if you could clarify, particularly in light of the waiver arguments that have been made by the government, as to what exactly you're arguing on appeal and what relief you're seeking. Because you state early in your brief that you're combining the appeals and that your brief is addressing both of them. I take it at least the procedural due process claim is one that goes to the merits appeal, not just the motion to reopen. And that's what we pointed out in our reply brief, exactly. That it's the combination of the two that we're challenging. So we weren't waiving a challenge to the initial decision of the BIA on its own. We don't think it's necessary to address that in isolation from the new facts in the motion to reopen. We think it's the combination. But are you then conceding that without reopening and without that supplemental evidence, that there is substantial evidence supporting the immigration judge's decision and the BIA's decision in the merits appeal? No, actually. And the reason is that, for example, family was documented when he was pro se. The failure of the board, the judge and the board, to consider that was an error. The problem with that appeal is that it's very hard to evaluate without the motion to reopen what the consequence of that error was. But my answer is, if there had been no motion to reopen, this board could look at the failure of the judge to develop the record, to inform him of what he needed to present, and to do follow up on what he did present. It does amount to a due process violation, which would be enough to remand the case back. But we don't want just a remand, right, for a new BIA decision. We actually would ask this court to look at both cases together and identify that, with the motion to reopen, he has presented a prognostication case. And therefore, we would ask not just for a remand to the board for a new board decision. We're asking for a remand, finding that he presented a prima facie case that deserves reopening. We think that the first appeal alone would only get him a remand to the board for a new decision, whereas the combination shows that he made a prima facie case and the whole thing should be reopened. Otherwise, I'm afraid we'll go back to the board and go back in front of you again. I try to avoid that. All right. You have five minutes to rebuttal. Appreciate that. Thank you. Ms. Murphy? Good morning, Your Honors. And may it please the Court, Lindsay Murphy on behalf of the Attorney General. So, Your Honors, this case, as you've noted, involves two consolidated petitions for review. Beginning first with a petition for review on the agency's decision denying the petitioner's motion to reopen, the government here argues that the board did not abuse its discretion in declining to reopen Mr. Serrano's case. It properly concluded that Mr. Serrano failed to present new material and previously unavailable evidence in support of his motion to reopen. At least some of that evidence includes things that occurred after the initial hearing. How can the board in such a summary way make that statement and not even identify or engage at least that evidence that relates to incidents that took place afterwards or that were related to him afterwards or country developments after the hearing? Sure. Well, much of the information, there are articles regarding gang violence in El Salvador that post-date the immigration court hearing. However, those articles really are very much duplicative of the types of information that of the evidence that the petitioner submitted to the immigration judge. It involves violence by gangs, tension between gangs on the one hand and the Salvadoran government and police on the other hand. And while in 2015 there may have been a break of a truce, as I believe the petitioner's expert affidavit notes, none of this evidence really shows a dramatic shift in the way that it doesn't show any really difference in the amount of violence. And I think as petitioner's evidence shows, El Salvador is currently the murder capital of the world. And so it has been consistently a very violent country. Gangs have consistently targeted individuals for extortion as a way of financing their operations. And so this isn't a situation where we've had a very peaceful country to begin with and the petitioner submits new information to show that violence has exploded in the country. It's been something that's been consistent throughout, especially during the time that the petitioner has been in immigration proceedings. But the expert posits that it deteriorated. And there are articles and materials that he submits in support of the motion to reopen that suggest that it has further deteriorated. In light of the standard that we've set out, in Zhang, in Thien Ju, how can we say it's not an abuse of discretion when the board has not even identified those documents, much less explained why it is not given regard to them? Well, it's not an abuse of discretion here, considering the evidence in light of what has already been in the record. And while the conditions may have deteriorated in the sense that there is no longer a truce between the government and the gangs, the evidence also shows that never during the time of the truce was violence against private individuals lessened. So that is something that has remained consistent. So even if this evidence of a truce and the decline of conditions in El Salvador may be new technically, it's not necessarily material evidence that changes the results of the case because it is something that has been ongoing. It has been a risk that has faced Salvadoran citizens throughout this time. But it does seem to go specifically to the question of the relationship between the police and the gangs with the ability of the police to protect those who might otherwise be subject, for example, to torture. Why isn't it material, at least to that extent? That is, doesn't it need under our precedent to have been addressed by the BIA? CAT eligibility isn't even addressed in the opinion. Well, CAT eligibility is addressed, albeit in a cursory manner, in the board's decision on the motion to reopen. However, the immigration judge in her decision and the board in its consideration of the direct appeal do address CAT more directly. And it's not necessarily, for the CAT standard, the ability of the Salvadoran authorities to protect an individual from torture, but it's whether or not they remained willfully blind or were to acquiesce. And so the ability to protect or unwillingness to protect goes to the asylum and withholding of removal standard. And so it's a bit different. And so there's nothing in the record to show, either on the motion to reopen or in this underlying decision or underlying application to show that the Salvadoran authorities would acquiesce or remain willfully blind to Mr. Serrano's torture by others or by the gangs. And so that's because there was no evidence presented of that, the agency reasonably concluded that their reopening of his proceedings was not warranted, that there would be no change in the outcome of his case, even considering all of this evidence that he submitted with the motion to reopen. You don't think it would have made a difference had the evidence that he submitted, particularly the expert's affidavit, on the question of whether one central reason for his being targeted twice, shot at once, shot at a second time, was his membership in a particular social group? Well, the thing is here, the expert affidavit certainly sheds light on country conditions and historical background of gang activity in El Salvador. However, there's nothing in the expert report that requires a finding of the reasons that these unknown individuals, we still don't know who they were to this day, the reason that they were motivated to target Mr. Serrano. And looking at the record, looking at the notes of the credible fear interview that Mr. Serrano had initially and looking at the statements that he made before the immigration judge, he says repeatedly, the reason that I was targeted is because, as a soccer player, they believed I made a lot of money. And then they came after me for money. They came after me because I didn't pay rent. And so that is a consistent theme throughout his testimony and throughout his responses to questions by government officials. But if the board assumes, I'm sorry, but if the board assumes that membership, that being a professional soccer player is membership in a social group, then isn't that evidence sufficient to show that one central reason for him being targeted was his membership in this particular social group? Not necessarily, Your Honor. And let's see. So the board assumes the group of professional soccer players who, due to the ubiquity of soccer in El Salvador, are celebrated and rewarded by El Salvadoran society. And so that is the group that Mr. Serrano's attorney on direct appeal posited to the government. And although the board assumed the cognizability of that group and also that he held an anti-gang political opinion, what it concluded was that Mr. Serrano's own testimony that he had been targeted because of the money that he made, rather than his status as a soccer player, so to speak, was the reason or the motivation. That's a little hard to separate out. Isn't that where the due process concerns come into play? That is, he identified himself as a soccer player. He also identified his being perceived as having wealth as a reason he was being targeted. But where the immigration judge didn't ask about the significance of being a soccer player, didn't take note of publicly available documents about the imputed anti-gang political opinions that go along with the soccer academies, or work he had done earlier in his career, for example, didn't ask questions about continuing threats to the family members and whether they had been, as his affidavit makes clear, specifically asked about his whereabouts and indicating that they were targeting him. We may not have in this record a particularly strong nexus, but isn't that because those questions weren't asked? The record wasn't developed where we had someone who was pro se, who was using an interpreter and who was participating from a detention center by video. I certainly understand your concerns, Your Honor, but here it's clear that the petitioner, he was given several continuances at the outset of his proceedings to find an attorney, to retain an attorney. He was also advised at least twice, if not more times, of his ability or opportunity to submit evidence in support of his claim. Mr. Serrano clearly had a firm grasp of what he needed to do based on the evidence that he was able to submit. He got news articles about gang violence in El Salvador. He got a letter from the mayor of his hometown. He got letters from his previous employers. He got letters from his family members and letters documenting injuries that his brothers had incurred prior to his hearing. So it's not like he was at this hearing and had really no idea what was going on. He was a fully engaged participant of this despite being pro se, despite being detained, and despite not speaking English as a native language. Is there someplace in the record going to your adversary's point about him receiving notice about what it is he needed to prove and what the options were in terms of social groups or types of evidence or corroboration that would be warranted? Is there someplace we can see him receiving that notice? I don't believe that the immigration judge told him or laid out explicitly what he needed to supply in support of his claim, but that's not something that the immigration judge was required to do. She was required to make sure that he knew what type of relief that was available to him, which was asylum, withholding of removal, and cap protection. She was required to make sure that he knew he had the opportunity to present evidence in support of his claim, to cross-examine witnesses, to present witnesses of his own if he wanted to. And I think all of those things are pretty clear given the fact that he did submit that evidence and he did participate fully in his hearing. But there's nothing that requires the court, the immigration judge, to explain the intricacies of asylum law, for example, or to identify exact pieces of evidence which he's required to present. And here, there was no adverse credibility determination. There was no adverse corroboration determination denying his claim for failure to present evidence in support of his applications. But there was, for example, a finding that there wasn't a nexus, something you were arguing in your appeal as well, that there wasn't evidence in the record that he was targeted because of his, again, assuming a particular social group. But even with the limited information that came out at the hearing, putting aside the affidavit, don't we have there that within days of his failure to make payment and alerting gang members that he wasn't going to continue making payments, that he's shot? Gang members are coming to his home and asking his mother what hospital he's in while he's hospitalized, that within days of his being released from the hospital and returning to the neighborhood, he's again shot? And that while he's, over the next couple of years, moving around trying to avoid the gangs, continues to get information from family members that the gangs are looking for him and are closing in on him until the point he sees them or believes that he sees that activity, leading him to come to the United States. Given that sequence, why isn't it error for the immigration judge and the BIA to say there's no evidence that he was targeted because of his affiliation with the social group of either soccer players or high-profile individuals who are resisting gang activity or those with the infuriated political opinion of opposing gangs? Well, Your Honor, my first response to that would be the record actually supports a slightly different sequence of events which I think materially affects what the outcome of this type of situation would be. And so here, while the petitioner was targeted for extortion money, the shooting that happened happened across the street from his home at the home of a neighbor, the doctor. There were three or four other individuals with the petitioner. Unknown assailants came and shot at the group. They killed the doctor. The petitioner was shot several times. He was able to flee. Nobody came after him. I thought he testified that somebody did come after him and shot him in the feet. I think as he was fleeing, but they didn't pursue him to his home as he was running away. I think this was all just part of the... I thought he testified that he didn't go directly home because the assailants were between the doctor's house and his house and that he eventually did make it home. My understanding from the record, Your Honor, is he didn't go to his mother's house because the assailants were between the doctor's house and the mother's house, but he did go to his own house, which was in another direction. My mistake. Yes. So following that shooting, he was taken to the hospital where police investigators questioned him. A news report of the incident, of the shooting, including where the petitioner had been taken to the hospital, was published in the newspaper. There is no evidence that the assailants came after the petitioner despite knowing where he was. In fact, there was a nearly three-year gap between that first shooting and the second shooting, which happened after he was released from prison. He was in prison for a couple of years. He was in prison for a couple of years. Nobody seems to have bothered him while he was in prison. But shortly after he gets out of prison, he's targeted again. He's targeted again, and again in his mother's neighborhood, again by unidentified individuals who were riding on a motorcycle and shot at the bus stop that he was standing at. But in the record, in his testimony to the immigration judge and even in his affidavit in support of the motion to reopen, the petitioner really doesn't give any detail as to what was going on at that bus stop. Were they shooting at him? Were there other individuals with him who were being shot? There's nothing really to differentiate what happened to the petitioner from just general crime and violence, which unfortunately is very prevalent in El Salvador at this time. And so based on those two incidents and the lack of information about who targeted him, whether these incidents were connected, and why they targeted him, the agency, you know, substantial evidence supports the agency's underlying decision that he did not establish a nexus to a particular social group for his failure to establish a motive for why he was targeted. And the agency really didn't abuse its discretion in declining to reopen because while voluminous, the evidence supplied on reopening really doesn't shed light on motive. And so that's what was the agency's ultimate determination here. What do we do with this transcript that reflects, in some ways, very similar to cases like Chan v. Attorney General, the frustration of the immigration judge focusing in, and what we described in that case as nitpicking on things like whether he told the police the names of the shooters in 2008, whether he was formally discharged from the hospital on a certain day, or whether he continued rehabilitation and was discharged later, details about the brothers' medical records, limiting Mr. Serrano to yes or no answers when he was trying to give fuller explanations. In light of that treatment of the pro se petitioner, on the one hand, and what's been presented in support of the motion to reopen, showing what fuller responses might have provided, why shouldn't we find here that the situation is closer to those cases where we've concluded there wasn't a due process violation or sufficient concerns that a new hearing's warranted? Well, there are a couple of instances which petitioner identifies where the immigration judge stops him short when he's beginning to answer a question other than the one that the immigration judge had asked. And it seems that part of that may have been something getting lost in translation or something not necessarily being understood the first time around. And while the immigration judge was in a tough spot here because having a pro se petitioner before her, her duty was, yes, to develop the records, but also to query whether the responses coming from the petitioner are consistent and to be able to make her ultimate determination regarding his eligibility for relief. But the fact that she became frustrated or a little bit annoyed that she wasn't getting direct answers from the petitioner isn't reason in and of itself to send this case back as a result of a due process violation. Here, the petitioner, while he claims that these reasons are enough, the fact is he had an opportunity to file a motion to reopen, to submit all this additional evidence, but none of it bears out his claim in a way that the court should rule that the board abused its discretion in denying the motion to reopen. He was able to submit all of this stuff and have it considered a second time around. And you don't think it would have made a difference had he been able to submit it initially? No. Because it seemed to me the board's decision was this is not new material evidence. It's not new material evidence and it doesn't establish his prima facie eligibility for relief. And so even considering all of the evidence that he did ultimately submit, which he claims he was deprived of an opportunity to submit before, it wouldn't change the outcome of his case. Have you listened to the hearing? No, Your Honor. We don't have access to that either. All right. Okay. Thank you. Judge Krause, anything else? One other question. On the issue of particular social group, it appears just taking a look at recent cases that have come from the BIA that we seem to be seeing on a somewhat systematic basis the BIA focusing in on nexus and not addressing the question of the contours of a particular social group. Is that in fact the case from your perspective? And do we need to be concerned in terms of looking to the BIA's expertise and the development of the law if the BIA in cases like this one is declining to address the question of particular social groups and definition of them in lieu of concluding that there's not a nexus? I don't think that that's a problem with the Board at all, Your Honor. Dealing with these types of cases every day, I see a lot of Board decisions that do directly address the cognizability of a particular social group. And so in those instances where the Board does deny relief on the grounds of nexus, I think it's because that's the most direct and legitimate way to deny a claim. And it may be, as you know, in this case with, or excuse me, in this court with Valdivieso-Galdamez, where this court declined to defer to the Board's definition of a particular social group. The Board has since responded in matter of MUVG and matter of WGR, which are two cases clarifying the Board's definition. And so that has yet to be decided by this court whether deference is due. But even despite that, at least I have briefed at least one case where the Board does rely heavily on cognizability of a particular social group in the Third Circuit despite not having a ruling yet on its decisions in matter of MUVG. And WGR. So it's certainly not something that the Board is shying away from. It does seem, though, where the Board is making a decision purportedly on the grounds of nexus. But, you know, as apparent here, it's citing to the matter of MCM with the parenthetical explaining that it's for the proposition that it's not recognizing the social group. At that point, the nexus is really becoming the proxy for the Board's decision on the particular social group. When we're trying to review those decisions, having clarity about the basis for them so that we can both address in a meaningful way, assist with the development of the law, know what it is we're reviewing, and abide by the Chenery Doctrine would certainly be helpful. Certainly, and I appreciate your concern, Your Honor. And I do know the parenthetical you're talking about, which is a little confusing, the reason that they added it here, and I would just say that it's superfluous because it really doesn't relate to nexus at all, where the main statement that the Board is making on page 2 of its motion to reopen decision simply relates to nexus. And so I would just say that that parenthetical is superfluous here. Judge Maggard, any questions? No, I have none. Thank you. Thank you very much. Thank you, Your Honors. Mr. Mattingly? Thank you. There's a couple points I'd like to follow up on. One, when a pro se person is told, you can apply for asylum or protection under the Convention Against Torture, but not told what that means. He's not given any meaningful information. How would he know that one requires a nexus and one does not, for example? That's a legal point that an unsophisticated person might know I'm afraid and know what evidence to present and why he's afraid but not understand that really crucial legal question. And the judge in this case, she does have a hard job, but that is her job. She is obligated to develop the record. She is obligated to tell the person what the requirements are and find out if he qualifies. And he was told he can present evidence. He was actually never told he could present witnesses in the record. The judge never even says that, which I think is important. On the CAT case in particular, the new evidence of the country conditions goes exactly to acquiescence. And I think Judge Krause asked me this, and I didn't answer it completely the first time around, which is, at the very least on the CAT case, the new evidence in the motion to reopen about the changed country conditions and the expert specifically saying that the government will not protect him from the certain abuse that he is facing really shows that the BIA gave short shrift to the consideration of the CAT case in the motion to reopen. And if nothing else, we think that it's 100% clear that the court has to rule in petitioner's favor on that point. And additionally... What is the relief that follows from that? Is it remanding to the board to reconsider the motion to reopen? The board had a chance to consider the motion to reopen already. I don't think they get a second bite of the apple when they fail to consider all the evidence that was presented. And I think this court can look at the evidence presented and find that in the motion to reopen, he made a prima facie case. We would believe both for asylum and CAT. And therefore, the board was wrong not to reopen and remand. So your request of relief would be to find that the board erred in denying the motion to reopen, and remand it to the immigration judge to conduct a new hearing? Yes, Your Honor, that's exactly what we're asking for. Okay. Counsel, I have one question here. If you were to prevail on your due process issue, is there sufficient evidence, if developed, for your petitioner to prevail without the new evidence that you proffered? I believe there is, in the sense that the number of incidents regarding attacks on him and his family members show that his family is a particular social group, and as well, the reason for those attacks. As the court mentioned when my opponent was up here, how those are tied to the recency of the threats and the stop payment, I think that it is clear that there was a case presented the first time around, but for the errors of the agency in developing and evaluating it, he could prevail. But I don't feel that it's necessary for this panel to address that in isolation, because I think the due process case is stronger when the prejudice is documented, which is exactly what the motion to reopen does. So I think it's actually easier for the panel to reach that question by looking at the two together, the original and the motion, because it fully documents the prejudice of the original errors. Isn't that a catch-22, though? Because if the issue is seeing the prejudice of what he could have introduced, that would seem to be a concession that the information was previously available. Well, I would argue it's a catch-22 against him, because of what I said at the beginning, which is that he was never put on notice of what is relevant to obtain and present, and so he couldn't present it. And then when he finally is able to, he's told, oh, you can't, because you could have done it before. That's exactly what the Ninth Circuit in Petare says is unfair, and that's the position. He's in a catch-22, because he has no idea that it's even relevant to present it, because the judge never explains to him the basic requirements of asylum, never explains to him the importance of other people's experts' evaluations, and so he's never on notice of what he could get that would fill in those gaps. He can get the basic evidence of, my family's attacked, shot, threatened, et cetera. That's self-evident. That's why he's afraid. But the legal significance of tying that to this thing called a particular social group or political opinion, he has no clue what to do to fill that gap in the record, and so he can't do it until he gets out and gets an attorney and presents that, and then he's told it's too late. That seems to go to the Procedure of Due Process claim, which was appealed in the first appeal, in the Meares case. So am I understanding you correctly that that's not evidence that he was able to bring to bear on the first appeal without going through the step of the motion to reopen to expand the record and demonstrate what should have come in with due process? That's correct, and the evidence for that is the board's first decision, where they said, well, we'll look at the due process and we see that the judge did not fail to consider anything he presented. Well, that wasn't the due process he was arguing. He was arguing the due process violation was he couldn't present more because he wasn't told to, and then when he presents that and says due process violation, the board in a totally separate paragraph in the second decision says, oh, we considered due process already, so it's nothing new here. Well, of course, it was all new, and they hadn't actually considered due process because they misidentified the real due process problem. The due process problem wasn't the thing that the agency failed to consider what was presented. The real due process problem was that's just a Meares error. The real due process error is not developing, not informing him, not developing the relevant record, which can only be documented through the motion to reopen. So he never got a chance to have that considered. The agency never addressed any due process issue. Let's go to what's required, then, of immigration judges, and this goes back to Judge Gnansky's question at the outset. Are we saying that immigration judges are bound to tell petitioners, you need to present more evidence about this? Isn't our case law as to procedural due process violations, that that comes into play when a petitioner is prevented from presenting their case? It's not the role of the immigration judge to present the case for the petitioner. I would argue that if the judge fails to inform a pro se individual, here are the basic legal requirements for asylum or CAT, and then he doesn't present those basic legal requirements, he's prevented from doing so because there's no way he could have known the legal requirement to do so. All he knows is I have to put down what I am afraid of. But how could he fill in the gap of tying that to a political opinion, or how can he fill in the gap of a particular social group? I thought the thrust of your procedural due process argument was that because his questions were cut off, because of the rating about particular details that weren't material, and with the tone that comes across in the transcript, that that prevented him from making his own case. You seem not to be focusing an argument on notice about particular legal requirements or elements of a claim. I think both are at play here. I'm sorry I didn't answer completely. I do think that the judge cut him off. I do think that the judge prevented him from coming forward with more affirmative facts. And that would be one claim that the board failed to address, and that would require a remand. But I think there's a bigger picture, which the motion to reopen documents, that evidence like that which the expert presented, he could not have presented himself. And so the fact that he didn't know it was necessary to present that, because the judge never even explained the basic requirements of asylum. Any other questions? Judge Nygaard, any questions? No, thank you. Thank you very much. The case was extremely well argued, and we'll take it under advisement. Thank you, Your Honor.